993 F.2d 1546
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CAN-AM ENGINEERED PRODUCTS, INC., Plaintiff-Appellant,
v.
INTERNATIONAL TOOLS LTD., ITL Industries, Ltd., and Ventra
Group, Inc. Defendants-Appellees.
 No. 92-1696.
 United States Court of Appeals, Sixth Circuit.
 April 22, 1993.
 
 Before MILBURN and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is a breach of contract case in which the main issue is whether a selling agent was entitled to receive commissions on sales made after the agent's representation of a manufacturing company had expired. The manufacturer maintains that the governing contract did not provide for post-expiration sales commissions. The selling agent maintains that the contract did provide for such commissions and that extrinsic evidence should have been looked to, if necessary, to show this.
 
 
 2
 Applying Michigan law, the district court determined that the contract was unambiguous and that it did not provide for the payment of post-expiration commissions. We conclude that the district court reached the correct result, and we shall affirm the judgment.
 
 
 3
 * Can-Am Engineered Products, Inc., the plaintiff in this case, entered into a contract with the Reflex Division of International Tools Ltd. (ITL) in 1981. Can-Am agreed to serve as Reflex's manufacturing representative, and Reflex agreed to pay a five percent commission on all sales arranged by Can-Am. The following two clauses of the contract dealt with the end-point of the arrangement:
 
 
 4
 "6. The agreement will be for a period of five (5) years with a termination of six (6) months written notice by either party;
 
 
 5
 7. In the event that Reflex desires to terminate the arrangement full commission will be paid during the six month period of notice and thereafter 50% of the commission for the following six months."
 
 
 6
 In 1982 the parties signed a contract addendum that changed the arrangements for payment of commissions after termination:
 
 
 7
 "10. In the event that current or future purchase order agreements are obtained on a multi-year or an extended basis, or, less than a one year term, the time figures in paragraph seven (7) shall be adjusted by the following method:
 
 
 8
 1) The first half ( 1/2) of the remaining term of said agreements from the time of termination notice shall be paid at full commission.
 
 
 9
 2) The second half ( 1/2) of the remaining term of said agreements from the time of termination notice shall be paid at 50% of the commission."
 
 
 10
 The relationship between Reflex and Can-Am proved to be profitable for both parties, and in 1984 they discussed broadening the contract to include the Tools Division of ITL as well as the Reflex Division. ITL eventually sent Can-Am a memorandum setting forth ITL's understanding of agreements reached during these discussions. The 1984 memorandum is central to the dispute, and we set out substantially all of it:
 
 
 11
 "It is our understanding that the following are the terms and conditions of the arrangements negotiated between I.T.L. Industries Limited and Can-Am Engineered Products, Inc. (Can-Am) over the past several weeks.
 
 
 12
 These arrangements encompass dealings between Can-Am products in both the Reflex and Tools Divisions.
 
 
 13
 The following are the terms and conditions that have been agreed to:
 
 
 14
 (1) TERM OF AGREEMENT
 
 
 15
 The term of the agreement for the Tools Division will be for five (5) years commencing May 1, 1984 and ending April 30, 1989. At the same time as entering into the agreement with the Tools Division, the current Reflex Division commission agreement will be extended for a period of five (5) years from May 1, 1984 through April 30, 1989.
 
 
 16
 (2) ACCOUNTS TO BE ASSIGNED TO CAN-AM
 
 
 17
 Tools Division--Can-Am will be assigned the responsibility to service all of the accounts within the territory of Michigan, Ohio, Indiana, Illinois and Wisconsin except for the following accounts:
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 In addition to the above house accounts, I.T.L. at its discretion, may from time to time determine in conjunction with Can-Am that it would be in the best interest of both parties for other accounts to be added to this list of house accounts.
 
 
 21
 Reflex Division--Can-Am will be assigned all of the accounts in the territory of Michigan, Ohio, Indiana, Illinois and Wisconsin with the exception of Evart Products and Guide Lamp.
 
 
 22
 (3) The commission rates on sales will be as follows:
 
 
 23
 Tools Division--house accounts, zero; current customers, 3%; all new accounts, 5%.
 
 
 24
 Reflex Division--5% on all sales.
 
 
 25
 The above commission rates are to be negotiable when in the best interest of both I.T.L. and Can-Am to do so. It is understood that where prices must be reduced to obtain orders, that this price reduction may result in the re-negotiation of the commission rate.
 
 
 26
 (4) NON-PERFORMANCE CLAUSE
 
 
 27
 In the event that Can-Am fails to perform to expectations, I.T.L. reserves the right to terminate the above agreement either in whole or in part.
 
 
 28
 (5) TERMINATION CLAUSE
 
 
 29
 In the event that I.T.L. terminates the above agreement, Can-Am will be paid commissions at the full rate for a period of six (6) months and at one-half ( 1/2) the rate for a further six (6) months.
 
 
 30
 I trust that this summarizes the discussions that have been agreed upon."
 
 
 31
 Robert E. Deane, the president and chief executive officer of ITL, and Kenneth P. Hedgewick, ITL's vice president for marketing, signed the memorandum on April 24, 1984. It was not contemplated that Can-Am would sign the memorandum, and no one from that company did sign it. Neither did anyone from Can-Am raise any question about the memorandum's fidelity to what had been negotiated.
 
 
 32
 Can-Am continued to serve as a manufacturing representative for the Reflex Division of ITL until April 30, 1989, the expiration date specified by the 1984 memorandum. Meanwhile, in 1988, ITL merged with Ventra Group, Inc. Can-Am made repeated attempts to get Ventra to agree to an extension of the contract beyond the 1989 date, but Ventra rejected these overtures.
 
 
 33
 Can-Am subsequently claimed that with respect to accounts obtained by it before the 1989 expiration date, it was entitled to commission payments on sales made after the expiration date. For example, if a customer signed a five-year purchase order agreement with Ventra in January of 1989, Can-Am claims to be entitled to a five percent commission on all sales made thereunder up to January of 1994. Ventra, for its part, denied all liability for commissions on sales made after April 30, 1989.
 
 
 34
 Can-Am brought the present action in April of 1991, invoking the diversity jurisdiction of the district court. Four theories were advanced as to why Can-Am was entitled to damages: breach of contract, "procuring cause," unjust enrichment, and promissory estoppel. Can-Am also asserted a claim for tortious interference with contract based upon Ventra's hiring of a former Can-Am employee.
 
 
 35
 After discovery was completed, Ventra moved for summary judgment on all counts. The district court (Rosen, J.) granted the motion. The court determined that the 1984 memorandum had ripened into a contract because Can-Am had accepted the terms of the document through performance and silence. Can-Am does not challenge this determination on appeal, but continues to press the breach of contract and procuring cause elements of its claim. The issue as to Ventra's hiring of the former Can-Am employee is not before us.
 
 II
 
 36
 On review of a grant of summary judgment, we consider the evidence in the light most favorable to the non-moving party. Summary judgment is appropriate if the pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. The party moving for summary judgment must point to the absence of a genuine issue of material fact, but once it has done so the opposing party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir.1989), quoting Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986)). Under Michigan law, questions of contract interpretation are governed by the law of the place where the last act necessary to create a binding contract took place. McLouth Steel Corp. v. Jewell Coal and Coke Co., 570 F.2d 594, 601 (6th Cir.), cert. dismissed, 439 U.S. 801 (1978). The 1984 memorandum became binding by reason of Can-Am's performance in Michigan, so Michigan law applies here.
 
 
 37
 The district court's rationale for rejecting Can-Am's breach of contract claim was very straightforward: The 1984 memorandum provided separately for termination of the contract because of poor performance by Can-Am and for expiration after five years. Post-termination commissions were provided for in the event of termination before the five years had run, but not afterward. Because there was no provision calling for the payment of commissions after the expiration of the contract at the end of the five year period, and because provision was clearly made for payment of commissions upon termination, Ventra had no responsibility to pay post-expiration commissions. We agree with the district court that the 1984 memorandum did not contemplate that Can-Am would be entitled to commissions after the contract expired.
 
 
 38
 * * *
 
 
 39
 Can-Am urged the district court to consider parol evidence in the form of deposition testimony given by the two ITL officials who signed the 1984 memorandum. The court declined to do so.
 
 
 40
 Michigan law permits extrinsic evidence to be received as an aid to contract interpretation in two situations. Where a contract is ambiguous on its face, extrinsic evidence may be admitted to indicate the parties' actual intent. Where the contract is not ambiguous on its face, extrinsic evidence may be admitted to show the existence of an ambiguity and to demonstrate the parties' actual intent. Goodwin, Inc. v. Coe, 392 Mich. 195, 220 N.W.2d 664, 671 (1974). Extrinsic evidence submitted for either purpose is not admissible if it is inconsistent with the written contract terms. C.E. Hale Corp. v. Butler Polymet, Inc., et al., No. 88-1066, slip op. at 4 (6th Cir. Feb. 1, 1989), construing Union Oil Co. of California v. Newton, 397 Mich. 486, 245 N.W.2d 11, 12 (1976).
 
 
 41
 Can-Am argues that its extrinsic evidence ought to have been admitted to show that contract language which seemed clear on its face was actually ambiguous. The depositions in question, however, do not disclose any ambiguity with respect to the payment of post-expiration commissions. Witness Hedgewick indicated that he thought there was some ambiguity in the termination clause of the 1981 Agreement.[1] Although both witnesses indicated that the 1984 memorandum was designed primarily to serve as an extension of the 1981 agreement, neither witness pointed to any latent ambiguity insofar as the matter at issue here is concerned. Having failed to flag any extrinsic evidence that would show the presence of such an ambiguity, Can-Am cannot be heard to argue that the district court erred in not considering extrinsic evidence. "The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Street v. J.C. Bradford & Co., 886 F.2d at 1479-80. Accord, Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1034 (D.C.Cir.1988); Nissho-Iwai American Corp. v. Kline, 845 F.2d 1300, 1307 (5th Cir.1988).
 
 
 42
 * * *
 
 
 43
 In cases of this type, Michigan law recognizes a doctrine known colloquially as "procuring cause." The theory was set forth by the Michigan Supreme Court in Reed v. Kurdziel, 352 Mich. 287, 89 N.W.2d 479, 483 (1958):
 
 
 44
 "It would appear that underlying all the [disputed commission] decisions is the basic principle of fair dealing, preventing a principal from unfairly taking the benefit of the agent's or broker's services without compensation and imposing upon the principal, regardless of the type of agency or contract, liability to the agent or broker for commissions for sales upon which the agent or broker was the procuring cause, notwithstanding the sales made have been consummated by the principal himself or some other agent.... [I]f the authority of the agent has been cancelled by the principal, the agent would nevertheless be permitted to recover the commission if the agent was the procuring cause."
 
 
 45
 Reed was a case in which the plaintiff sales representative had orally contracted with a foundry owner to sell the foundry's wares. Predictably, the parties disagreed as to whether it had been contemplated that the plaintiff would receive commissions on reorders from customers whose orders the plaintiff had secured initially. After the plaintiff sent the foundry a letter demanding such commissions, the foundry terminated the contract.
 
 
 46
 In applying the above-stated law to the case, the Michigan court noted that there was ample evidence on which the jury could conclude, as it did, that the parties' contract had no set duration and that the agreement called for the plaintiff to receive commissions on all reorders. Noting that "[i]t would appear that the cancellation was made for the purpose of defendant-appellants receiving the benefit of the sales activities of plaintiff-appellee without payment of the commissions," and stating that "[i]t would further appear that the contract had therefore been breached," the court let stand a verdict in favor of the plaintiff. Id. at 484.
 
 
 47
 The case at bar presents quite a different situation. The 1984 memorandum took into account the inequity that might result if the contract were terminated early, and it provided for a period of reduced commission payments should Ventra choose to terminate before the five years had run. Can-Am was given significant protection with respect to the time and money expended on the development of customers for Ventra, because the arrangement enabled Can-Am to receive commission payments for up to eight years on accounts signed up early in the term of the contract. Can-Am had no legitimate expectation of long-term commission payments on business secured in the later years of the agreement, however, if an extension of the contract could not be negotiated.
 
 
 48
 It is axiomatic that so long as they deal with each other in good faith, contracting parties may choose to allocate risk and reward as they see fit. See, for example, MICH.COMP.LAWS § 440.1102 (noting that in transactions governed by the Uniform Commercial Code, parties may agree to vary the effect UCC provisions would otherwise have on their transaction). See also, Kirby v. Gibson Refrigerator Co., 274 Mich. 395, 264 N.W. 840 (1936). This case is an example of that axiom.
 
 
 49
 It is noteworthy that Reed dealt with the termination of a contract; the case at bar concerns only the expiration of a contract. The contract in Reed, moreover, was both oral and rudimentary; here the contract was in writing and quite detailed. Finally, there has been no showing that Ventra violated any contractual provision--an apparent sine qua non for application of the procuring cause doctrine. Reed, 89 N.W.2d at 484.
 
 
 50
 AFFIRMED.
 
 
 
 [1]
 Hedgewick made no mention of the termination clause in the 1984 memorandum. The reason is clear: the 1984 memorandum significantly clarified this point. In the memorandum, termination is clearly premised on the failure of Can-Am to perform up to expectations. Just as clearly, the termination clause does not anticipate six months' notice from either party before the contract expires on its own