**CLARK BROTHERS SALES COMPANY, Plaintiff,**

v.

**DANA CORPORATION and McQuay–Norris, Inc., Defendants.**

No. 99–72149.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 23, 1999.

David G. Byra, Bloomfield Hills, MI, for Plaintiff.

Thomas G. Cardelli, Royal Oak, MI, for Defendants.

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Clark Brothers Sales Company, a manufacturers' sales representative in the automotive aftermarket, commenced

this suit on March 30, 1999, in Oakland County Circuit Court, State of Michigan, asserting a variety of claims arising from the failure of Defendants Dana Corporation and McQuay–Norris, Inc., to pay commissions allegedly owed to Plaintiff for sales completed after the parties had terminated their agency agreement. On April 29, 1999, Defendants removed the case to this Court, citing diversity of citizenship among the parties.

By motion filed on September 1, 1999, Defendants now seek summary judgment in their favor on some or all of Plaintiff's claims.[1] Defendants' motion rests principally upon the language of the parties' written agency agreement, which expressly provides that "[t]he manufacturer [*i.e.,* Defendants] shall be obligated to pay agent [*i.e.,* Plaintiff] the commissions earned up to the date of termination." (Defendants' Motion, Ex. A, Agency Agreement at ¶ 3.) Defendants argue that this provision required them to pay commissions only for sales prior to the date of termination, and not for any post-termination sales. Defendants further contend that any implied-in-law duty to pay post-termination commissions for sales procured by the agent prior to termination would not apply here, as Plaintiff has produced no evidence of sales it procured that were completed after its termination as Defendants' sales representative.

In a response filed on October 5, 1999, Plaintiff argues that the parties' agency agreement is silent or ambiguous as to the issue of post-termination commissions. Thus, Plaintiff contends that it is appropriate to look to extrinsic evidence of the parties' intent in entering into the agreement, and that further guidance in construing the agreement can be found in the "procuring cause" doctrine recognized by the Michigan courts and the "life of the part" standard that has been widely adopted in the automotive part industry. On October 18, 1999, Defendants filed a reply brief in further support of their motion.

The Court held a hearing on Defendants' motion on December 9, 1999. Having reviewed the briefs and supporting materials submitted by the parties, and having considered the arguments of counsel at the December 9 hearing, the Court is now prepared to rule on this motion. This Opinion and Order sets forth the Court's ruling.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. The Terms of the Parties' Sales Representation Agency Agreement

In 1992, Karl Smith and Les Epstein purchased Plaintiff Clark Brothers Sales Company from its prior owners, thereby assuming Plaintiff's rights and obligations under a pre-existing relationship with Defendant McQuay–Norris[2] which dated back to 1989. Under this arrangement, Plaintiff, a sales representative for various

---

**1.** In their motion, Defendants characterize this case as involving only a "breach of contract dispute," (Defendants' Motion, Br. in Support at 1), and they focus their arguments solely on the question whether Plaintiff has a contractual or common-law right to the sales commissions it seeks. Plaintiff's Complaint, however, asserts a number of theories in addition to breach of contract, including breach of an implied covenant of good faith and fair dealing, quantum meruit, unjust enrichment, fraud, and violation of the Michigan Sales Representatives' Commissions Act ("SRCA"), Mich.Comp.Laws § 600.2961. Because Defendants do not address these other theories in their motion, it is not clear whether they seek only partial summary judgment on Plaintiff's breach-of-contract claim. As discussed below, however, the disposition of Plaintiff's other claims necessarily is closely related to the disposition of its breach-of-contract claim, and so the Court also will address these related theories.

**2.** In 1994, Defendant Dana Corporation acquired McQuay–Norris, but the parties' subsequent agency agreement continues to name McQuay–Norris as the manufacturer-principal, and McQuay–Norris apparently continues to do business as a distinct corporate entity. As the parties treat these two corporations interchangeably in their briefs, the remainder of this Opinion will refer to Dana and McQuay–Norris collectively as "Defendants."

manufacturers in the automotive aftermarket, would represent Defendants at trade shows, procure new accounts, take orders for Defendants' products, re-box those products, and solicit sales of automotive parts manufactured by Defendants. In exchange, Plaintiff was paid a commission on Defendants' products sold in Plaintiff's territory, the State of Michigan, with the amount calculated as a percentage of the net invoice value of products shipped to this territory. This commission was payable even where a customer placed an order directly with Defendants themselves, and not through Plaintiff.[3]

The parties reduced this relationship to writing through a brief two-page agreement (the "Agency Agreement"), which was drafted by Defendants and presented to Plaintiff for execution each year at an annual trade show in Las Vegas. The Agency Agreement in effect at the time the parties terminated their relationship was signed by Smith and Epstein on behalf of Plaintiff on November 11, 1997, and provides in relevant part:

1) *AGENCY:* The manufacturer [*i.e.,* Defendants] hereby appoints the agent [*i.e.,* Plaintiff] as its sales agent for the territory described in Exhibit A attached hereto and made part hereof[4] to sell cataloged products produced and marketed by the manufacturer under the trade name "McQuay–Norris" and other program group. Packages for the wholesale and retail aftermarket as distinguished from and not including the motor vehicle original equipment market. The manufacturer reserves the exclusive right to sell and service national and regional accounts of its choosing without utilizing or compensating the agent.

2) *Compensation:* The manufacturer shall pay to the agent as its entire compensation for its services a commission as set forth in Exhibit B attached hereto and made a part hereof[5] on the net invoice value of all shipment of its cataloged products, to any part of agent's territory for which payment shall be received by manufacturer except for national or regional accounts where commission is paid in the originating territory or as agreed by manufacturer and agent(s). The commissions are to be paid on the fifteenth (15th) day of each month for all shipments made during the preceding calendar month. Exhibit B may be altered by the manufacturer from time to time by giving agent notice thereof in writing. Commission paid on account which becomes uncollectible in whole or in part will be charged back on the unpaid balance.

3) *Terms:* The terms of the agency shall be for one (1) year from the date hereof, and shall automatically be renewed for successive one (1) year terms unless terminated as hereinafter stated.... [E]ither party hereto may terminate this Agreement without cause upon thirty (30) days written notice to the other party.... **The manufacturer**

---

**3.** The parties explain that, in a typical situation, Plaintiff would pursue leads provided by Defendants and would secure a customer's initial order for Defendants' products. In this initial phase of a customer relationship, Plaintiff would re-box the products shipped from Defendants' factory, deliver these re-packaged products to the customer, and assist the new customer in making the transition to Defendants' products and placing them on the customer's shelves. After this initial order, the customer could place orders directly with Defendants, but Plaintiff would continue to receive a commission upon shipment of such direct orders to the customer.

**4.** Exhibit A in turn provides that Plaintiff's territory encompassed the State of Michigan.

**5.** Exhibit B sets forth a schedule of different percentages for different types of accounts. It establishes, for example, a five-percent commission rate for "[a]ll accounts sold under McQuay–Norris brand name with Regular Terms of Sales," and a commission rate of up to three percent for "[a]ll accounts sold under McQuay–Norris brand name with Modified Terms of Sales." Moreover, as indicated in paragraph (1) of the Agreement itself, Exhibit B confirms that "[a]ll Super Retail and any other customers of a national scope are non-commission accounts."

**shall be obligated to pay agent the commissions earned up to the date of termination.**

(Defendants' Motion, Ex. A (last emphasis added).)

## B. The Termination of the Parties' Agency Relationship

As noted earlier, the parties first established their agency relationship in 1989. In 1994, following Defendant Dana's acquisition of Defendant McQuay–Norris, Dana's in-house sales team assumed some of the national and regional accounts previously serviced by Plaintiff. This action apparently was authorized by paragraph (1) of the Agency Agreement, and Plaintiff does not challenge this action or claim any entitlement to commissions on sales generated by these transferred accounts.

In 1998, Defendants decided that Dana's internal sales force would take over the remaining accounts serviced by Plaintiff. Accordingly, by letter dated October 19, 1998, Defendants notified Plaintiff that the parties' agency relationship would terminate on December 1, 1998. (Defendants' Motion, Ex. D.) By its terms, this letter was intended to "serve as the minimum 30–day written termination notification stipulated in the current contract between McQuay–Norris and Clark Brothers Sales Company." (*Id.*) Again, Plaintiff does not contend that this notice was in any way insufficient to terminate the Agency Agreement, nor does it claim that any commissions are owed on orders placed prior to the termination date of December 1, 1998. Rather, this case concerns only the commissions for orders placed after the termination date.

## C. Procedural Background

Plaintiff brought this suit on March 30, 1999, filing a seven-count Complaint in Oakland County Circuit Court, State of Michigan. This Complaint asserts the following claims: (1) breach of sales representation agreement; (2) breach of "Public Act 125," the Michigan Sales Representatives' Commissions Act, Mich.Comp.Laws § 600.2961; (3) breach of implied covenant of good faith and fair dealing; (4) quantum meruit; (5) unjust enrichment; (6) fraud; and (7) "procuring cause," an apparent reference to the doctrine set forth by the Michigan Supreme Court in *Reed v. Kurdziel*, 352 Mich. 287, 89 N.W.2d 479 (1958). Notwithstanding this variety of legal theories, all of Plaintiff's claims appear to rest upon the basic premise that Defendants wrongfully failed to pay post-termination commissions to Plaintiff on accounts procured by Plaintiff during the parties' agency relationship, under a "life of the part" methodology of determining sales commissions.[6]

Defendants removed the case to this Court on April 29, 1999, citing diversity of citizenship among the parties. By motion filed on September 1, 1999, Defendants now seek summary judgment in their favor on some or all of Plaintiff's claims. In support of their motion, Defendants argue that the plain language of the parties' Agency Agreement dictates that Plaintiff is not owed any post-termination sales

---

**6.** The Sixth Circuit Court of Appeals has described this methodology as follows:

> [The plaintiff] asserts that the use of a "life of the part" provision [in an agency agreement] is a common practice in the automobile industry because the sales representative must invest a great deal of time, effort, and money in securing the initial sale. Once the initial sale is made, the buyer may continue to use the part in the manufacture of its automobiles for many years. As many of the parts manufactured by [the defendant] are functional items, such as plastic knobs, switches, and latches, the buyer may use the same part for many model years. Even after the buyer discontinues use of such part, sales will continue for repair and replacement parts. Thus, to guard against opportunistic termination, in which the manufacturer terminates the sales representative to avoid having to pay commission on future sales, the independent sales representatives inserted "life of the part" provisions in their agreements, requiring that commissions continue to be paid despite termination.

*Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 502 n. 5 (6th Cir.1995).

commissions. Plaintiff responded to this motion on October 5, 1999, and Defendants filed a reply brief on October 18, 1999.

On December 9, 1999, the Court held a hearing on Defendants' motion. For the reasons set forth below, the Court finds that the Agency Agreement controls this dispute, and that Plaintiff is not entitled under the Agreement to post-termination commissions.

## III. *ANALYSIS*

### A. The Standards Governing Defendants' Motion

In their present motion, Defendants seek summary judgment in their favor on Plaintiff's breach-of-contract claim, and perhaps on the other claims as well. Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[7] The *Celotex* Court explained:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these

---

**7.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

principles in considering Defendants' motion.

### B. The Agency Agreement Is Not Ambiguous, and Does Not Call for Payment of Commissions on Post–Termination Sales.

Defendants' principal argument in support of their motion rests upon the language of the parties' Agency Agreement. In particular, Defendants point to the paragraph of the Agreement entitled "Terms," which permits either party to terminate the agency relationship "upon thirty (30) days written notice," and which concludes with the sentence, "The manufacturer shall be obligated to pay agent the commissions earned up to the date of termination." (Agency Agreement at ¶ 3.) According to Defendants, this provision defines the full extent of their responsibility to pay commissions upon termination, and creates no obligation to pay such commissions under a "procuring cause" or "life of the part" approach. The Court agrees.

■ As in all cases where two businesses have agreed to set down the terms of their relationship in a written agreement, the Court's inquiry here must begin with the language of the Agency Agreement itself, and this inquiry is guided by certain basic tenets of Michigan contract law. "The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v. Chrysler Corp.,* 445 Mich. 109, 517 N.W.2d 19, 29 n. 28 (1994). Where possible, this intent must be ascertained through "the words used in the instrument," as the Court "does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *Sheldon–Seatz, Inc. v. Coles,* 319 Mich. 401, 29 N.W.2d 832, 834–35 (1947) (internal quotations and citation omitted).

■ The initial determination whether contract language is ambiguous is a question of law; if there is no ambiguity, the meaning of the contract likewise is a question of law for the Court to decide. *Port Huron Educ. Ass'n v. Port Huron Area School Dist.,* 452 Mich. 309, 550 N.W.2d 228, 237 (1996). Only "[w]here the contract language is unclear or susceptible to multiple meanings" does its interpretation become a question for the trier of fact. *Id.* The Court, however, must take care to avoid "creat[ing] ambiguity where none exists." *Smith v. Physicians Health Plan, Inc.,* 444 Mich. 743, 514 N.W.2d 150, 157 (1994). Rather, a contract is ambiguous only if "its words may reasonably be understood in different ways." *Raska v. Farm Bureau Mut. Ins. Co.,* 412 Mich. 355, 314 N.W.2d 440, 441 (1982). In resolving this matter, the Court must construe the Agency Agreement "according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." *Dillon v. DeNooyer Chevrolet Geo,* 217 Mich.App. 163, 550 N.W.2d 846, 848 (1996).

■ The Agreement at issue here is plain enough in what it does say: namely, that upon its termination, Defendants were obligated to pay Plaintiff "the commissions earned up to the date of termination." (Agency Agreement, ¶ 3.) The parties agree that Defendants terminated the Agreement on December 1, 1998 in accordance with the 30–day notice requirement of paragraph 3, and that Defendants, in accordance with the concluding sentence of this same paragraph, paid all commissions derived from orders placed before the termination date of December 1. Defendants contend that this is all that the Agreement required, and that no further commissions are owed.

Plaintiff, however, argues that the Agreement is ambiguous because of what it *does not* say. Specifically, it contends that the Agreement is silent on the question of commissions earned on orders received *after* the termination date of December 1, and that this silence creates an ambiguity on the issue of post-termination commissions that should be resolved by resort to extrinsic evidence of the parties'

intent. Plaintiff further asserts that this extrinsic evidence establishes, at a minimum, an issue of fact as to whether the parties agreed to a "life of the part" approach to determining payment of post-termination commissions.

Upon reviewing the plain language of the Agreement, and construing its provisions in accordance with their plain meaning, the Court cannot agree that it is silent or ambiguous as to post-termination commissions. At the conclusion of the paragraph dealing with termination, the Agreement expressly states that "[t]he manufacturer shall be obligated to pay agent the commissions earned up to the date of termination." (Agency Agreement at ¶ 3.) This provision explicitly defines the obligation Defendants owed to Plaintiff upon termination of the Agreement, and limits their obligation to payment of "commissions earned up to the date of termination." This language is not ambiguous, nor is it silent on the subject of post-termination commissions, merely because it fails to *also* state that post-termination commissions are *not* owed, or that Defendants must pay *only* the commissions earned before the termination date. Stated differently, no ambiguity arises from the mere fact that the parties could have phrased their obligations in both positive and negative terms, but elected to state them in only one of these two forms.

In a case involving nearly identical language in an agency agreement, the Michigan Court of Appeals held that the plaintiff was not entitled to post-termination commissions. *Barber v. SMH (US), Inc.,* 202 Mich.App. 366, 509 N.W.2d 791 (1993). The agency agreement in *Barber* provided that the plaintiff would be "compensated at a 10% rate for net billing to approved customer[ ]s in the assigned territory," and that, in the event of termination by either party, "commission will be paid on all orders received and shipped as of the date of the termination." 509 N.W.2d at 796. Despite the absence of any language specifically reciting that no post-termination commissions would be paid, the Court found it "clear from the agreement that plaintiff was not entitled to receive commissions on sales occurring after his termination." 509 N.W.2d at 796.[8]

This conclusion enjoys the support of at least two well-established rules of contract construction. First, under the maxim "*expressio unius est exclusio alterius,*" Defendants' express promise to pay "the commissions earned up to the date of termination" excludes any implied promise to pay other sorts of commissions, such as the post-termination commissions sought by Plaintiff. *See Zynda v. Michigan Aeronautics Comm'n,* 372 Mich. 285, 125 N.W.2d 858, 859 (1964); *Grinnell Bros. v. Brown,* 205 Mich. 134, 171 N.W. 399, 400 (1919) ("The expression of one thing is the exclusion of another, and a thing expressed puts an end to tacit implication."). This principle is especially applicable here, where the promise in question is found in the portion of the Agreement addressing termination, and therefore is clearly meant to define the scope of Defendants' obligation to pay commissions upon termination of the parties' agency relationship. Under the Agreement, this obligation extends to payment of "commissions earned up to the date of termination," and no further.

Next, if the Agreement were viewed as silent on post-termination commissions, this construction would reduce its language regarding pre-termination commissions to unnecessary surplusage. *See Associated Truck Lines, Inc. v. Baer,* 346 Mich. 106, 77 N.W.2d 384, 386 (1956) (observing that contracts should be interpreted so that "effect and meaning [is] given to

---

**8.** In an unpublished decision, the Sixth Circuit similarly held that language in an agency agreement setting forth the commissions that *would* be paid upon termination—namely, commissions on "all orders accepted by [the manufacturer] prior to termination"—demonstrated the parties' agreement that post-termination commissions would *not* be paid. *Jack Peddie & Assocs., Inc. v. Advantage Life Prods., Inc.,* 1992 WL 230217, at *2, 976 F.2d 733 (6th Cir. Sept. 18, 1992).

every word therein, if possible"). Under the portion of the Agreement defining Plaintiff's compensation, Plaintiff was entitled to a commission on "the net invoice value of all shipment of [Defendants'] cataloged products, to any part of [Plaintiff's] territory," and this commission was to be paid on the 15th of each month "for all shipments made during the preceding calendar month." (Agency Agreement at ¶ 2.) Plainly, then, paragraph (2) required Defendants to pay pre-termination commissions to Plaintiff, consisting of all commissions that accrued prior to the termination date as a result of pre-termination shipments to Plaintiff's territory, and this obligation arose without the need for any language elsewhere in the Agreement providing that such pre-termination commissions must be paid. Yet, the Agreement *does* separately address pre-termination commissions, providing in paragraph (3) that Defendants would pay all commissions "earned up to the date of termination." Viewed in this context, the evident purpose of the language in paragraph (3) is not to restate an existing obligation imposed under paragraph (2), but to clarify that Defendants would pay *only* pre-termination and *not* post-termination commissions.

· In light of this unambiguous language requiring Defendants to pay only pre-termination commissions, the Court need not (and may not) look to any extrinsic evidence for guidance. In particular, the Court need not address Plaintiff's argument that the "life of the part" method of determining commissions is an "industry standard," nor its contention that the parties demonstrated through their actions an intent to adopt this "standard." Where the parties have stated their intent with sufficient clarity in their written agreement, it is not appropriate to look elsewhere for evidence that might support or undermine this stated intent. *See Sheldon–Seatz, supra,* 29 N.W.2d at 834–35.

In any event, the evidence and authorities cited by Plaintiff fail to support its attempt to invoke the "life of the part" method of determining its commissions. First, the decisions addressing the "life of the part" approach place no special importance on its purported status as an "industry standard," but instead rest upon evidence that the parties had expressly agreed to use this approach in calculating commissions. *See Terry Barr Sales Agency, Inc. v. All–Lock Co.,* 96 F.3d 174, 179–81 (6th Cir.1996) (finding disputed issues of fact as to whether the parties' oral agreement included a promise to pay "life of the part" commissions); *Kingsley Assocs., supra,* 65 F.3d at 502 (citing testimony at trial that the parties' oral agreement included a "life of the part" provision); *Kingsley Assocs., Inc. v. Del–Met, Inc.,* 918 F.2d 1277, 1281–83 (6th Cir.1990) (same); *Militzer v. Kal–Die Casting Corp.,* 41 Mich.App. 492, 200 N.W.2d 323, 324–25 (1972) (evidence at trial showed that parties had orally agreed to "life of the part" commissions for parts ordered by customers procured by the plaintiff). Here, by contrast, Plaintiff has failed to identify any evidence—apart from the parties' alleged "practice," discussed below—that Defendants agreed, notwithstanding the terms of the written Agency Agreement, to pay under a "life of the part" methodology. Indeed, Plaintiff's two principals, Karl Smith and Les Epstein, both conceded at their depositions that Defendants had made no oral representations to them regarding payment of post-termination commissions, whether "life of the part" or otherwise. (Defendants' Motion, Ex. B, Smith Dep. at 25; *Id.,* Ex. C, Epstein Dep. at 13.)

Moreover, although Plaintiff has submitted affidavits in which Smith and Epstein cite a purported "practice" of paying "life of the part" commissions, these assertions fail to withstand scrutiny. These affidavits describe the payment of commissions as follows:

Dana Corporation sent invoices/printouts 1–2 times per month and commission checks once per month to Clark Brothers, for all shipments on renewed purchase orders when a customer reordered a product through an account pro-

cured by Clark Brothers, for the life of the product.

(Plaintiff's Response, Ex. 6, Epstein Affidavit at ¶ 12; *Id.*, Ex. 7, Smith Affidavit at ¶ 12.) Plaintiff contends that these affidavits create an issue of fact as to whether Defendants' actual payment of commissions reflected a "life of the part" methodology.

The Court, however, fails to see how Epstein and Smith can accurately ascribe these payments to a "life of the product" approach, where Defendants' purported use of this methodology would become apparent only *after* the parties had terminated their relationship. Prior to termination, Defendants were required to pay—and presumably did pay, as Plaintiff does not contend otherwise—commissions on *all* shipments to Plaintiff's territory, regardless of whether these shipments were triggered by "renewed purchase orders," "customer reorder[s]," or other types of orders, and regardless of whether Plaintiff procured the initial sale that might trigger "life of the product" commissions on those orders. In other words, while the parties' relationship was ongoing, Plaintiff was entitled to receive precisely the same commissions *without regard* to whether the parties had or had not agreed to a "life of the part" approach. "Life of the part" commissions have significance only *after* the parties have terminated their relationship, when a terminated sales representative otherwise would not enjoy the fruits of his labor, *see Kingsley Assocs.*, 65 F.3d at 502 n. 5 (explaining that "life of the part" provisions ensure that "commissions continue to be paid despite termination")—and, of course, the crux of Plaintiff's complaint in this case is that Defendants have *refused* to pay these commissions. Thus, the Court

cannot accept Plaintiff's somewhat disingenuous and self-serving attempt to characterize Defendants' payment of commissions as evidence of its purported adoption of a "life of the part" approach. *See Stubl v. T.A. Systems, Inc.*, 984 F.Supp. 1075, 1096 (E.D.Mich.1997) (rejecting assertions in an affidavit that were "not substantiated by any independent evidence," but instead were contradicted by the record).

Finally, although Plaintiff apparently does not contend otherwise, the Court finds that there is no ambiguity in the Agreement's reference to commissions "earned" before the date of termination. Arguably, under a "life of the part" approach, a sales representative could claim to have "earned" a commission on an order placed after the termination date, by virtue of having previously procured the initial order that led to this subsequent order. Once again, however, the Agreement itself forecloses this argument, as it defines the mechanism by which Plaintiff "earned" its commissions. Specifically, in paragraph 2, captioned "Compensation," the Agreement provides that "[t]he manufacturer shall pay to the agent as its entire compensation for its services a commission ... on the net invoice value of all shipment of its cataloged products, to any part of agent's territory for which payment shall be received by manufacturer." (Agency Agreement at ¶ 2.)[9] Thus, as discussed earlier, Plaintiff "earned" its commissions under the Agreement based solely upon orders shipped to customers within its territory, without regard for whether those orders were placed by customers who were brought to Defendants through Plaintiff's efforts, or by customers whose initial purchases came through other means.[10]

---

**9.** The Agreement expressly exempts from this compensation all "national or regional accounts where commission is paid in the originating territory or as agreed by manufacturer and agent(s)." (*Id.*)

**10.** For example, under the Agreement, Plaintiff was entitled to (and presumably received)

commissions on orders placed by pre-existing customers of Defendants who first ordered Defendants' products before Plaintiff even began selling those products, so long as these orders resulted in shipments into Plaintiff's territory.

While the Agreement is sufficiently clear on this point to render any resort to extrinsic evidence unnecessary, the Court notes that the parties' conduct lends support to this view of how commissions are "earned." As noted earlier, Defendants reserved a right under the Agreement to "sell and service national accounts of [their] choosing without utilizing or compensating the agent." (Agreement Agreement at ¶ 1.) Defendants exercised this option in 1994, reclaiming for their in-house sales staff certain accounts previously serviced by Plaintiff. Yet, Plaintiff apparently does not contend that Defendants withheld commissions "earned" by Plaintiff on any post–1994 orders placed by these accounts.[11] This suggests Plaintiff's understanding, at least in 1994, that commissions were "earned" under the Agreement solely through the shipment of products into Plaintiff's territory, and not by virtue of Plaintiff's effort to initially procure particular accounts. Otherwise, Plaintiff presumably would claim an entitlement—and would be entitled, under a "life of the part" approach—to any post–1994 commissions derived from accounts initially procured by Plaintiff and then transferred to Defendants' in-house representatives.

Plaintiff, however, claims no such entitlement. Instead, its position on this point is entirely consistent with the plain language of the parties' Agreement, which required only that Defendants pay commissions on any orders shipped prior to the termination date of December 1, 1998. Because the parties agree that Defendants paid these commissions, and because the Agreement imposed no additional obligation to pay post-termination commissions, the Court finds that Defendants are entitled to summary judgment on Plaintiff's breach-of-contract claim.

---

**11.** To the contrary, Les Epstein testified at his deposition that, upon transferring certain accounts to their in-house sales team in 1994, Defendants had no further obligation to pay commissions on sales to those accounts. (Defendants' Motion, Ex. C, Epstein Dep. at 11–12.) Similarly, in *Roberts Assocs., Inc. v.*

## C. Michigan Law Imposes No Duty to Pay Post–Termination Commissions Under the "Procuring Cause" Doctrine, Where the Parties Have Provided Otherwise in Their Agency Agreement.

■ In addition to arguing that the Agency Agreement is ambiguous as to the issue of post-termination commissions, Plaintiff contends that such commissions are owed under the "procuring cause" doctrine set forth in *Reed v. Kurdziel*, 352 Mich. 287, 89 N.W.2d 479 (1958), and its progeny. Thus, Plaintiff's Complaint asserts a "procuring cause" claim, as distinct from Plaintiff's breach-of-contract claim. Upon surveying the relevant case law, however, the Court finds nothing in the "procuring cause" doctrine that would require Defendants to pay any commissions beyond those called for in the parties' written Agency Agreement. Accordingly, the Court concludes that Plaintiff's "procuring cause" claim fails as a matter of law.

In *Reed*, the Michigan Supreme Court addressed at length the principal/agent relationship that exists between a manufacturer and its sales representative. In that case, the plaintiff sales representative alleged that he had secured an oral agreement to be the exclusive sales agent for all customers he procured to purchase the defendant manufacturer's products, and that he was entitled to commissions on all original orders and reorders placed by these customers. The manufacturer, in turn, argued that it owed (and had paid) commissions only on sales made to these customers before the parties terminated their agency relationship.

Before considering the substance of these claims, the Michigan Supreme Court first summarized the law governing this particular type of agency relationship:

> *Blazer Int'l Corp.*, 741 F.Supp. 650, 652–53 (E.D.Mich.1990), the Court held that, absent an agreement to the contrary, a sales agent is not "entitled to continuing commissions on accounts which he has introduced to the principal, but which the principal subsequently appropriates for himself."

An examination of the law with reference to commissions allowed agents or brokers seems to indicate that it is difficult to determine a set line of decisions, particularly with reference to the right of an agent with an exclusive agency to recover commissions on sales made where he is the procuring cause. However, when they are viewed as a whole and brought into proper focus, they disclose the law applicable to the question is well settled and that the seeming confusion results from the application of that law to the particular facts of the specific cases in question. Vol. 12 A.L.R.2d 1363 states as follows:

"The relationship between agent or broker and principal being a contractual one, it is immediately apparent that whether an agent or broker employed to sell personalty on commission is entitled to commissions on sales made or consummated by his principal or by another agent depends upon the intention of the parties and the interpretation of the contract of employment, and that, as in other cases involving interpretation, all the circumstances must be considered.... This rule is recognized and stated in the American Law Institute, Restatement, Agency § 449 Comment a."

It would appear that underlying all the decisions is the basic principle of fair dealing, preventing a principal from unfairly taking the benefit of the agent[']s or broker's services without compensation and imposing upon the principal, regardless of the type of agency or contract, liability to the agent or broker for commissions for sales upon which the agent or broker was the procuring cause, notwithstanding the sales ma[y] have been consummated by the principal himself or some other agent. In Michigan, as well as in most jurisdictions, the agent is entitled to recover his commission whether or not [h]e has personally concluded and completed the sale, it being sufficient if his efforts were the procuring cause of the sale. In Michigan the rule goes further to provide if the authority of the agent has been cancelled by the principal, the agent would nevertheless be permitted to recover the commission if the agent was the procuring cause.

89 N.W.2d at 482–83 (citations omitted). The Court then applied these standards to the case before it:

Applying the law to the facts in the instant case, it would appear that there is ample evidence by which the lower court could find that an oral agreement was entered into by which plaintiff-appellee Reed was to handle the sales of defendants-appellants' [product]; that such contract was without limitation as to time; that plaintiff-appellee was to receive commissions on not only the original sales submitted by him but on all reorders.

89 N.W.2d at 483. Accordingly, the Court upheld a judgment for the plaintiff.

Admittedly, certain language in this decision—in particular, the Court's reference to liability owed by the principal "regardless of the type of agency or contract," 89 N.W.2d at 483—seems to suggest that "procuring cause" commissions must be paid in all cases, even where the parties' express agreement provides otherwise. Subsequent cases, however, have declined to construe Reed so broadly, and instead have focused upon Reed's observations that the relationship between principal and agent is "contractual," and that the obligation to pay commissions "depends upon the intention of the parties and the interpretation of the contract." Reed, 89 N.W.2d at 482–83.

For example, in Roberts Assocs., Inc. v. Blazer Int'l Corp., 741 F.Supp. 650, 652 (E.D.Mich.1990), the Court viewed Reed as holding that "[w]here the contract is silent, the agent is entitled to recover a commission on a sale, whether or not he personally concluded it, only where it can be shown that his efforts were the 'procuring cause.'" Accordingly, because the agreement in Roberts was silent on post-termination commissions, the Court found that

the plaintiff sales agent was entitled to commissions on any sales he procured before his termination. 741 F.Supp. at 653–55; *see also Terry Barr Sales Agency, supra,* 96 F.3d at 179 (quoting from *Reed,* and then identifying various issues of fact as to whether the parties "intended for post-termination commissions to be a term of their oral agreement"); *Del–Met, supra,* 918 F.2d at 1281–83 (citing *Reed* as holding that "[a]pplication of the 'procuring cause' doctrine depends on a determination of the intentions of the parties to the agency relation," and then pointing to evidence at trial that the parties "intended commissions to be paid 'for the life of the part'" under their oral agency agreement); *Barber, supra,* 509 N.W.2d at 796 (quoting from *Reed,* and then concluding that the parties' agreement expressly addressed, and foreclosed, the payment of post-termination commissions); *Militzer, supra,* 200 N.W.2d at 325 n. 5 (citing *Reed* for the proposition that "the plaintiff's right to commissions depends upon interpretation of his understanding with the defendant").

Similarly, in *Butterfield v. Metal Flow Corp.,* 185 Mich.App. 630, 462 N.W.2d 815, 817–18 (1990), the Michigan Court of Appeals sustained a jury verdict rejecting the plaintiff sales representative's "procuring cause" theory of recovery. Although one of the defendant manufacturer's officers testified that the parties' agency agreement "called for a three percent sales commission to be paid for all sales on defendant's accounts procured by plaintiff," this officer further testified that this agreement governed only "while plaintiff remained as a manufacturer's representative

for defendant." 462 N.W.2d at 818. Based on this testimony, and following its consideration of and extensive quotation from *Reed,* the Court held that there was "competent evidence to support the jury's finding that plaintiff [was] not entitled to posttermination sales commissions." 462 N.W.2d at 818.[12]

As this great weight of subsequent case law uniformly confirms, *Reed* does not require that the parties' express agreement as to the payment of commissions be supplanted by a "procuring cause" approach. Rather, the "fair dealing" principle set forth in *Reed* applies only where the parties have not addressed the subject of post-termination commissions, and seeks to ensure that the manufacturer does not unfairly benefit from the opportunistic termination of a sales representative after he has procured a sale but before the sale is consummated. Where the parties have expressed the terms of their "fair deal" in an express agency agreement, there is no basis for a court to impose different or additional terms such as a "procuring cause" standard. Consequently, having already found that the parties' Agreement addresses post-termination commissions, and that the Agreement does not call for payment of such commissions, the Court concludes that the "procuring cause" doctrine does not override this express Agreement.

Moreover, even if the Court were to conclude that the parties' Agreement is silent or ambiguous on the matter of post-termination commissions, it would be inappropriate to write a "procuring cause" term into the Agreement absent *some* evi-

---

12. Moreover, in a series of unpublished decisions, the Sixth Circuit has construed *Reed 's* "procuring cause" doctrine as applicable only where the parties' agreement does not otherwise address post-termination commissions. *See Sigmann v. Oakley, Inc.,* 1998 WL 199804, at *3, 145 F.3d 1333 (6th Cir. Apr. 14, 1998) ("In the absence of an express provision governing [post-termination] commissions, Michigan law applies 'the basic principle of fair dealing.'" (quoting *Reed* )); *Can-Am Engineered Prods., Inc. v. International Tools Ltd.,* 1993 WL 127944, at *4–*5, 993 F.2d 1546

(6th Cir. Apr. 22, 1993); *Jack Peddie & Assocs., Inc. v. Whitmor Mfg. Co.,* 1992 WL 355475, at *4–*5, 980 F.2d 729 (6th Cir. Dec. 2, 1992) (finding that the procuring cause doctrine applied where "the issue of post-termination commissions was undecided at the time the contract was executed"); *Jack Peddie & Assocs., Inc. v. Advantage Life Prods., Inc.,* 1992 WL 230217, at *2, 976 F.2d 733 (6th Cir. Sept. 18, 1992) (holding that the doctrine did not apply where the parties "otherwise agreed" that post-termination commissions would not be paid).

dence that the parties had agreed to a procurement-based method of calculating commissions. As discussed earlier, however, the Agreement calls for payment of commissions based on *orders shipped* to Plaintiff's territory, and *not* sales or customers procured. The Court is aware of no case imposing an obligation to pay procurement-based commissions in the absence of any record evidence, whether written statements or oral assurances, that the parties intended that commissions be determined on a procurement basis.

In an effort to fill this evidentiary gap, Plaintiff first points to language in Exhibit B to the Agency Agreement, which sets different commission rates for various types of "accounts sold."[13] Although Plaintiff argues that this reference to "accounts sold" suggests a procurement-based arrangement, the Court finds this proposed construction strained and utterly implausible. In particular, Exhibit B does not require that an account be sold *by Plaintiff*; rather, it speaks of the *terms* under which these accounts are sold, whether by Plaintiff or through some other means. Thus, nothing in Exhibit B modifies the shipment-based method of determining commissions as set forth in the body of the Agreement itself.

Next, Plaintiff points to the statements in the Smith and Epstein affidavits regarding "life of the part" commissions, and asserts that these two individuals would testify at trial that Plaintiff's commissions were based on account or sales procurement. As discussed earlier, however, the Court cannot accept bald and conclusory assertions in affidavits as to "life of the part" commissions, where these assertions find no support in the evidentiary record, and indeed are largely contradicted by the record. In fact, the affidavits themselves undercut any claim that commissions were based solely on procurement, as both Smith and Epstein state that Plaintiff "earned commissions based upon shipment

of products to customers on accounts which [Plaintiff] procured **and/or serviced** for Defendants," and that Plaintiff's job as a sales representative for Defendants was "to procure purchase orders and new accounts ... [and] **service existing accounts.**" (Epstein Aff. at ¶¶ 8, 9; Smith Aff. at ¶¶ 7, 8 (emphasis added).) These statements, like the Agreement itself, indicate that commissions were based on shipment and not procurement.

Moreover, what little evidence there is in the record as to Defendants' actual practice of paying commissions belies any agreement to pay on a procurement basis. As Karl Smith testified at his deposition:

Q: Would you agree with me that sales were already being generated by the time Clark Brothers started representing for McQuay–Norris?

A: Yes.

Q: Would you agree with me that those sales that were previously being generated prior to your representing McQuay–Norris once you started representing McQuay–Norris you started getting commissions on those sales?

A: Yes, sir.

Q: So in other words, those sales even though you did not procure the client you were getting commissions from the sales that were being generated?

A: Yes, sir.

\* \* \* \* \* \*

Q: .... Commissions would not be paid until there was actual shipment of the parts ordered, correct?

A: Yes, sir.

Q: So in other words if somebody just placed an order, but the parts weren't shipped you could not get commissions?

A: Yes, sir.

(Defendants' Motion, Ex. B, Smith Dep. at 28, 30.)

---

13. For example, Exhibit B to the Agreement sets a five-percent commission rate for orders shipped to "accounts sold under McQuay–

Norris brand name with Regular Terms of Sales."

This testimony establishes two points, neither of which is consistent with a procurement-based scheme: (1) that Plaintiff received commissions on accounts and sales procured by its predecessor as Michigan sales representative for Defendants;[14] and (2) that Plaintiff's right to commissions was triggered by shipment of products, and not procurement of customers or orders. Likewise, as discussed earlier, Defendants' exercise in 1994 of their right to reclaim certain accounts for servicing by their in-house sales team, and their concomitant cessation of commissions on those reclaimed accounts, is inconsistent with the procurement-based scheme alleged by Plaintiff.[15]

In the end, Plaintiff is left with the subjective belief of its principals, Smith and Epstein, that the parties agreed to a procurement-based commission scheme, despite the absence of any objective evidence upon which to base this belief. Yet, under well-established principles of contract law, no enforceable obligation arises without mutual assent, and this mutual assent must be demonstrated through objective evidence of the parties' actual words and conduct. *See Goldman v. Century Ins. Co.*, 354 Mich. 528, 93 N.W.2d 240, 243 (1958) (explaining that the requisite "meeting of the minds" must be "judge[d] by an objective standard, looking to the expressed words of the parties and their visible acts"); *Kamalnath v. Mercy Memorial Hosp. Corp.*, 194 Mich.App. 543, 487 N.W.2d 499, 503 (1992). Moreover, as the party opposing Defendants' motion, and the party that would bear the burden at trial of establishing an enforceable promise that Defendants did not fulfill, it is Plaintiff's obligation to produce evidence of the parties' alleged agreement to determine commissions through a procurement-based methodology. Having failed to produce any evidence that might satisfy this burden, and having failed to overcome the express language of the Agreement itself calling for a different methodology, Plaintiff may not go forward with its "procuring cause" theory of recovery.

**D. In Light of the Enforceable Contract Encompassing the Parties' Agency Relationship, Plaintiff's Alternate Theories of Recovery Cannot Be Sustained.**

As noted earlier, Plaintiff's Complaint sets forth seven separate claims, including: (1) breach of sales representation agreement, (2) breach of Michigan's Sales Representatives' Commissions Act ("SRCA"), Mich.Comp.Laws § 600.2961, (3) breach of implied covenant of good faith and fair dealing, (4) quantum meruit, (5) unjust enrichment, (6) fraud, and (7) "procuring cause." In their motion for summary judgment, however, Defendants frame this case as involving solely a breach-of-contract dispute, and they largely fail to ad-

---

**14.** At the hearing on Defendants' motion, Plaintiff's counsel suggested that Mr. Smith's testimony is ambiguous on this point, as he might have been referring to commissions that he and Mr. Esptein received on sales and customers that *they* did not procure, but were nonetheless procured by *Plaintiff* under its prior ownership before Smith and Epstein purchased the company. This reading of Mr. Smith's testimony seems far-fetched, however, where he first confirmed that "sales were being generated by the time **Clark Brothers** started representing" Defendants, and then was immediately asked to verify that "you started getting commissions on **those sales.**" (Defendants' Motion, Ex. B, Smith Dep. at 28 (emphasis added).) At any rate, even if Smith's testimony does not definitively rule out a practice of paying procurement-based commissions, it certainly lends no affirmative support to the existence of such a practice.

**15.** Indeed, as Defendants point out, given Plaintiff's concession that Defendants were not obligated to pay any further commissions on the accounts reclaimed in 1994, Defendants apparently could have reclaimed *all* of the accounts serviced by Plaintiff through this same mechanism, and thereby entirely terminated any further obligation to pay commissions. It is implausible, to say the least, to construe the Agreement as authorizing this means of avoiding payment of future commissions, and yet prohibiting Defendants from achieving the same result through termination of the agency relationship in accordance with the terms of the Agreement.

dress many of Plaintiff's theories of recovery apart from its breach-of-contract claim.[16] Nevertheless, despite Defendants' failure to separately address each claim, the Court finds that Plaintiff's remaining theories of recovery simply cannot be sustained as a matter of law, in light of the express Agency Agreement governing the parties' relationship and the payment of commissions.

■ First, it is clear that Plaintiff cannot proceed on its claim under Michigan's SRCA, absent a showing that Defendants failed to pay commissions owed under the parties' Agreement. In the recent case of *Flynn v. Flint Coatings, Inc.,* 230 Mich. App. 633, 584 N.W.2d 627, 629 (1998), the Michigan Court of Appeals held that the SRCA does not "create a new obligation or impose a new duty" to pay sales commissions, and that a principal "who was not liable under the common law is not liable under the SRCA." Rather, this statute merely "changes the remedy for failure to pay sales commissions." Thus, because Plaintiff is not owed any commissions under the parties' Agency Agreement, it cannot state a viable claim under the SRCA.

■ Next, Plaintiff's claim of a breach of the implied covenant of good faith and fair dealing suffers from both legal and factual defects. Under Michigan law, this implied covenant does not override the express terms of the parties' contract, and cannot form the basis for a claim independent of that contract. *See, e.g., General Aviation, Inc. v. Cessna Aircraft Co.,* 915 F.2d 1038, 1041 (6th Cir.1990); *Cook v. Little Caesar Enters., Inc.,* 972 F.Supp. 400, 409 (E.D.Mich.1997); *Van Arnem Co. v. Manufacturers Hanover Leasing Corp.,*

776 F.Supp. 1220, 1223 (E.D.Mich.1991). More specifically, the Court in *Roberts Assocs., supra,* explained that "the concept of fair dealing is subsumed within the procuring cause doctrine," and does not create a "separate and independent obligation." 741 F.Supp. at 654 n. 2. Having already determined that the procuring cause doctrine does not apply here because the parties otherwise agreed to the terms of their "fair deal," and having found that Defendants satisfied the express terms of the Agreement with respect to commissions, the Court concludes that Plaintiff's breach-of-implied-covenant claim cannot be sustained.

■ Plaintiff's two quasi-contractual theories, quantum meruit and unjust enrichment, similarly fail as a matter of law in light of the parties' contract. The parties agree that the Agency Agreement governed their relationship, and this Court has already held that the Agreement is not silent on post-termination commissions, but instead provides that such commissions need not be paid. Under these circumstances, where the Agency Agreement addresses and controls the payment of commissions, Plaintiff cannot pursue quasi-contractual claims based on different obligations purportedly arising outside the four corners of that Agreement. *See Terry Barr Sales Agency, supra,* 96 F.3d at 181 ("Where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for ... unjust enrichment."); *Turner Assocs., Inc. v. Small Parts, Inc.,* 59 F.Supp.2d 674, 683 (E.D.Mich.1999) (finding that a quantum meruit claim would be foreclosed if "it is first established that a valid and enforceable contract governed

---

**16.** Defendants' motion arguably encompasses the breach-of-contract and "procuring cause" claims, but not the remaining claims. Alternatively, Defendants' motion can perhaps be viewed as attacking all of Plaintiff's claims, regardless of their respective theories of liability, on the premise that Plaintiff was paid all the commissions it was owed, and thus has suffered no damages under any theory of recovery. (*See, e.g.,* Defendant's Motion, Br. in Support at 1 ("[I]t is clear that Clark Brothers

has no evidence of damages for lost commissions and Defendants are therefore entitled to summary judgment.").) The Court believes, however, that such an approach inappropriately folds liability considerations into the damage phase of the case. Accordingly, the Court will address Plaintiff's various theories of liability on their merits, without considering at this point the damages that could be shown if Plaintiff were able to sustain these theories.

defendant's payment of post-termination commissions"); *Barber, supra,* 509 N.W.2d at 796–97 (finding no basis for a claim of unjust enrichment where there was an express agreement "regarding plaintiff's entitlement to commissions").

Finally, Plaintiff's fraud claim also cannot stand apart from its breach-of-contract claim. According to the Complaint, Plaintiff's claim of fraud rests upon alleged representations that "if Plaintiff would procure accounts and/or purchasers for Defendants' products, th[en] Defendants would pay commissions to Plaintiff for each order." (Complaint at ¶ 36.) As noted earlier, however, both Karl Smith and Les Epstein testified at their depositions that Defendants made no oral representations to them regarding payment of post-termination commissions. It follows, therefore, that Plaintiff's claim must rest solely upon representations made in the Agency Agreement. Such contractual promises, however, cannot serve as the basis for a claim of fraud. *See Wynn v. State Auto. Mut. Ins. Co.,* 856 F.Supp. 330, 337 (E.D.Mich.1994); *Kovacs v. Electronic Data Systems Corp.,* 762 F.Supp. 161, 166 (E.D.Mich.1990) ("The nonperformance of a promise ... is not fraud nor is it any evidence of fraud."); *Marrero v. McDonnell Douglas Capital Corp.,* 200 Mich.App. 438, 505 N.W.2d 275, 279 (1993) (holding that the "future promises" cited by the plaintiff "were contractual and cannot be the basis of an action for fraud"). In any event, the Court has found that Defendants fulfilled their promises by paying the commissions called for under the Agency Agreement. Consequently, Plaintiff's claim of fraud cannot be sustained.

## IV. *CONCLUSION*

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED.